```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA


KAREN JENKINS, et al.          :        CIVIL ACTION
                               :
          v.                   :
                               :
THE UNION LABOR LIFE INS. CO., :
INC., et al.                   :        NO. 10-7361
```

MEMORANDUM

Bartle, J.                                   October 24, 2012

The twelve plaintiffs[1] are former employees of defendant Amalgamated Life Insurance Company ("Amalgamated").  In their amended complaint, plaintiffs allege that they are entitled to benefits under a defined benefit pension plan sponsored by Amalgamated.  Plaintiffs contend that in denying them benefits under this plan, Amalgamated has violated provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1003-1461.  Before the court are the cross-motions of plaintiffs and Amalgamated for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

---

1. The named plaintiffs in this case are Karen Jenkins, Jacqueline Mays, Susan Lolli, Linda Russel, Teresa Lattanze, John Van Allen III, Donna Anderson, Debra Kontra, Michelle Quarles Troy Johnson, Sharon Schultz, and Raymond Gunther.  The amended complaint also lists a John Doe plaintiff who "represents a group of [Amalgamated] employees, terminated by the company in October 2009, who have not yet retained legal representation."  We will dismiss the action as to John Doe.  Hindes v. FDIC, 137 F.3d 148, 155-56 (3d Cir. 1998).

I.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or ... showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).

A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable jury to find for the plaintiffs.  Id. at 252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  We view the facts and draw all inferences in favor of the non-moving party.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  When ruling on a motion for summary judgment, we may only rely on

admissible evidence.  See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).

II.

The undisputed facts in the record describe the following.

Prior to May 9, 2004, plaintiffs worked in the claims department of Union Labor Life Insurance Company, Inc. ("ULLICO") at a facility known as the Pennsylvania Service Center ("PSC"). ULLICO offers insurance and other products to labor unions as well as their members and their members' families.  While employed with ULLICO, plaintiffs were members of the Office and Professional Employees International Union ("OPEIU"), Local 153, and the terms and conditions of their employment with ULLICO were governed by a collective bargaining agreement.  As a benefit of their employment with ULLICO, plaintiffs were participants in a defined benefit pension plan.[2]

---

2.  Plaintiffs contend that their pension from ULLICO was not provided as a term of the collective bargaining agreement between OPEIU and ULLICO.  Schedule C of the relevant collective bargaining agreement, which plaintiffs have submitted as an exhibit, sets forth the "Schedule of Benefits for Employees" and included a section entitled "OPEIU, Local 153 Pension Fund." That section described the contribution to the pension fund required of ULLICO, the management of that fund, and the circumstances under which an employee would become eligible for benefits from that fund.  Plaintiffs assert that ULLICO sponsored an additional defined benefit pension plan in which plaintiffs participated that was not provided through the collective bargaining agreement between ULLICO and OPEIU.  This contention is not supported by the deposition testimony of plaintiff Jacqueline Mays, on which plaintiffs relied for this assertion.

On March 9, 2004, ULLICO entered into Administrative Services Agreements with two Amalgamated affiliates, ALICARE, Inc. and Alicare Medical Management, Inc.  Under these agreements, which had a term of three years, these Amalgamated affiliates assumed responsibility on May 10, 2004 for performing claims administration services on ULLICO insurance policies. Previously, ULLICO performed its own claims administration.  As part of these agreements, ULLICO sold some assets to the affiliates, including a claims processing software system known as Eldorado.

In 2004, Amalgamated, which had offices in White Plains, New York and in New Hampshire, contemplated moving the ULLICO claims processing work from the PSC to its New York facility.  Amalgamated ultimately decided against doing so because that would also require its New York staff to become proficient with the Eldorado software system within a period of time that was deemed unworkable.

Sometime in March 2004, ULLICO vice-president Kelly McKee, *nee* Ellston, met with ULLICO employees and explained that they would have the opportunity to work for Amalgamated when the Administrative Service Agreements took effect.  According to plaintiff Jacqueline Mays, Ellston said that the benefits the ULLICO employees would have at Amalgamated would "mirror" the benefits they had at ULLICO.

On March 19, 2004–after the Administrative Services Agreements were signed but before they became effective–Claire

-4-

Levitt, an executive vice president of Amalgamated, Jeanne
Jarvis-Meara, a vice president of human resources, and other
Amalgamated personnel met with ULLICO employees, including
plaintiffs.  According to plaintiff Mays, the Amalgamated
representatives stated in this meeting that the benefits offered
at Amalgamated would "mirror" those offered at ULLICO and that
ULLICO employees would be "grandfathered" into those benefits,
that is, that time worked at ULLICO would be credited toward
Amalgamated benefit programs.

At this meeting, the Amalgamated representatives
distributed to the ULLICO employees a document entitled
"Questions and Answers for ULLICARE Staff about Amalgamated Life
March 19, 2004" (the "Q&A").[3]  It appears from exhibits in the
record that two days before the meeting, the Q&A was created from
a list of questions and answers that Levitt, Jarvis-Meara, and
other Amalgamated employees had compiled in or around February
2004 to help prepare them to answer anticipated queries from
ULLICO staff.  The Q&A that was distributed to the ULLICO
employees at the PSC confirmed that all of them would be offered
a job with Amalgamated.  It explained in general terms its
expectations of its employees and its benefit structure.  The Q&A
stated Amalgamated was "committed to ... keeping the PSC facility
open," but that employees' pay likely would be reduced.  The
document further noted that once they became Amalgamated

---

3.  We presume that ULLICARE is an entity affiliated with ULLICO
or an alternative name for ULLICO.

employees, the then-ULLICO employees would be covered under Amalgamated's health insurance plan.  Significantly, the Q&A contains the following two questions and the accompanying answers:

> **Q.   Will our time with ULLICARE be counted?**
>
> A.   We will recognize ULLICARE service for certain benefits that are based on years of service such as accruing vacation and short term disability.  The letter of offer will provide your adjusted service date.  Otherwise your service date will be considered to be 5/10/04.
>
> **Q.   Is there a Pension Plan?**
>
> A.   There is a 3-year eligibility period for PSC employees to join the Amalgamated Life staff pension plan.  Once you become eligible, the 3-year wait period will be credited towards the 5-year vesting requirement.

(bold in original.)[4]  According to the Q&A, ULLICO employees hired by Amalgamated would have a 401(k) plan, that is, a defined contribution plan, "similar to the plan you currently have with an additional match."

Either at the March 19, 2004 meeting or at a subsequent meeting in March, an Amalgamated representative distributed another document entitled "A General Overview of Coverage and Benefits as a UFA Union Employee."  This document, which is dated "(03/2004)," refers to a 401(k) savings program but does not

---

4.   The internal Amalgamated document from which the Q&A appears to have emerged did not have an answer to the question, "What is happening to my pension benefits?"  Instead it said, "Jeanne [Jarvis-Meara] to provide answer."

mention a defined benefit pension plan.  Plaintiff Mays states in
an affidavit that the ULLICO employees at the meeting were
informed that the "general overview" document they received
actually described the benefits for Amalgamated employees at the
New York office but would "show [them] what to anticipate for
benefits when [they] became employed" at Amalgamated.  The
meaning of the phrase "UFA Union Employee" is not explained in
the record.

Amalgamated extended offers of employment to each of
the plaintiffs in letters dated April 7, 2004 from Jarvis-Meara,
Amalgamated's vice president of human resources.  Although it was
not expressly stated in the letters, it is apparent from the
record that all parties understood that the ULLICO employees who
accepted Amalgamated's offer of employment would become
Amalgamated employees on May 10, 2004.  The letters communicating
the offer contained the position, salary, and vacation time the
recipient would have at Amalgamated.  Concerning benefits, the
letters stated, "You received a *General Overview of Coverage and
Benefits* during my recent visit.  This Overview gives you a quick
summary of our benefit programs." (italics in original.)  It
contained no mention of the Q&A or of any pension benefits.  The
letters further noted that questions about benefits would be
addressed at an orientation scheduled for April 20 and 21, 2004.
None of the plaintiffs asked an Amalgamated representative about
pension benefits when they received their offers of employment.
All of the plaintiffs accepted Amalgamated's employment offer.

-7-

At the time of these events in early 2004, some Amalgamated personnel participated in a defined benefit pension plan known as the UNITE Staff Retirement Plan (the "Pension Plan"), which has since been renamed the Consolidated Retirement Plan.  This plan provides pension benefits to the employees of multiple employers, including Amalgamated.  It is governed by a board of trustees, two of whom are named by Amalgamated.  At the meeting of the board of trustees held on April 14, 2004, it amended the plan to exclude those employees who would be at the PSC.  The minutes state:

> Mr. Hirsch, [an Amalgamated executive vice president present at the meeting][5] then reported that Alicare, Inc. and Alicare Medical Management had entered into an agreement with Union Labor Life Insurance Company, to provide administrative services to Union Labor Life.  This would entail the retention of approximately 100 employees formerly employed by Union Labor Life in King of Prussia, Pennsylvania.  Upon motion duly made, seconded and unanimously carried, the Pension Plan was amended to provide that the Amalgamated Life and Alicare Medical Management employees employed in the Prussia [sic] office would not be covered for pension benefits.

On May 7, 2004, two days before the Administrative Service Agreements would take effect, Amalgamated and the Industrial, Technical & Professional Employees Union ("ITPEU"), a union affiliated with OPEIU, signed a memorandum of understanding

---

5.  Hirsch testified at his deposition that he was not a member of the board of trustees of the Pension Plan, but he attended the meeting and signed the minutes of the meeting.  Another document in the record described him as an "administrator."

stipulating that ITPEU would be the exclusive collective bargaining representative for the purpose of negotiating a collective bargaining agreement ("CBA").

ULLICO terminated plaintiffs on May 9, 2004, and plaintiffs became Amalgamated employees on May 10, 2004. At that time, no CBA between ITPEU and Amalgamated had been negotiated.

In December 2004, ITPEU and Amalgamated signed a CBA that would govern the terms of plaintiffs' employment with Amalgamated until December 31, 2006 and would apply retroactively to the beginning of plaintiffs' employment on May 10, 2004. The ITPEU representative participating in the negotiations raised the prospect of the new Amalgamated employees receiving pension benefits, but Amalgamated stated that they could not afford to pay pension benefits to the personnel hired from ULLICO. Accordingly, the CBA did not contain any provision entitling plaintiffs to participate in Amalgamated's defined benefit pension plan. It did provide, however, that plaintiffs could participate in a 401(k) defined contribution plan. Each plaintiff received a copy of the CBA.

According to the affidavit of plaintiff Mays, the plaintiffs later received a document entitled "A General Overview of Coverage and Benefits as a Union Employee @ King of Prussia," dated July 2005. This document listed as one of the benefits of working at Amalgamated:

> PENSION PLAN (For Regular Employees Only)
> - eligibility begins after three years of
> employment based on [Amalgamated] hire date

-9-

           - vesting schedule: 100% vested after 5 years
           of employment

Mays' affidavit does not say when this document was distributed to plaintiffs or who provided it to them.  She says only that it "was given to myself and the other eleven Plaintiffs, by [Amalgamated] to let us know what we would receive in the King of Prussia Office of [Amalgamated]."  There is nothing in the record from the other plaintiffs with respect to this document.

     In March 2007, ITPEU and Amalgamated reached agreement on the terms of a second CBA that would govern the conditions of plaintiffs' employment between January 1, 2007 and December 31, 2009.  ITPEU initially requested that its members receive defined benefit pensions, but it dropped this request during the negotiations.  Like the CBA reached in 2004, the 2007 CBA did not provide that plaintiffs would receive pension benefits as a condition of their employment.  Each plaintiff received a copy of the 2007 CBA.

     In 2007, ULLICO decided not to renew the Administrative Service Agreements with the two Amalgamated affiliates, ALICARE, Inc. and Alicare Medical Management, Inc.  ULLICO did agree, however, to a more limited arrangement with these affiliates that reduced the number of claims to be processed by the PSC staff. Amalgamated again considered closing the PSC and moving the remaining ULLICO claims processing work to its New York office. Amalgamated decided against this course of action and responded

-10-

to the decreased work load at the PSC by shifting claims processing work from its other customers to the PSC.

In 2009, ITPEU and Amalgamated began negotiating a third CBA.  In April 2010, after ITPEU members had already rejected one proposed CBA, Amalgamated proposed two alternative CBAs to ITPEU.  Under both choices, plaintiffs' workweek would increase from 35 hours to 37.5 hours and plaintiffs would become participants in the Pension Plan.

The terms of the first proposal provided that Amalgamated would give plaintiffs annual raises but would not pay any money on a weekly basis to compensate for plaintiffs' additional 2.5 hours of work.  Amalgamated would pay annual raises of 2.0% in the first contract year and 2.5% in both the second and third contract years.  Under this first proposal, ITPEU members would participate in the Pension Plan and have an "[a]ccrued benefit from June, 2009 for all employees who meet vesting requirements."

Under the second proposed CBA, Amalgamated would increase plaintiffs' weekly pay to compensate for the additional 2.5 hours of work, but it would not pay annual raises.  ITPEU members would also participate in the Pension Plan but those employees that had met the vesting requirement would not have accrued benefits until January 2011.

The ITPEU union representatives explained these options to the union members by email.  Plaintiff Debra Kontra asked whether "Under opt #2, wouldn't we be losing only 1 ½ years of

pension? (June 2009 - Jan 2011)."  Union representative Damon
Oliver responded, "Yes, that's what is says.  You would be
foregoing an accrued pension benefit for a portion of the three
years."  The ITPEU members at Amalgamated voted in favor of the
second option, which as noted, deferred the accrual of pension
benefits until January 2011.  In May 2010, ITPEU and Amalgamated
signed a Memorandum of Understanding ("MOU"), not a CBA, that
embodied the proposal for which the union members had voted.  It
states:

> Effective January 1, 2011, and subject to the
> approval of the Plan Trustees, all employees
> in the collective bargaining unit will be
> placed in the Staff Pension Plan.  For
> vesting purposes, years of service dating
> back to May 10, 2004 will be recognized.  For
> benefit accrual purposes, service effective
> January 1, 2011 will be recognized.

It is unclear why ITPEU and Amalgamated signed only an MOU in
2010 and did not sign a CBA

     During the negotiations that led to the 2010 MOU, both
the union and Amalgamated's management were aware that
Amalgamated's lease on the PSC in King of Prussia was due to
expire in February 2011.  In April 2010, while negotiations were
still proceeding, executive vice president Claire Levitt emailed
another Amalgamated vice president, Nina Chakraborty, that the
company should assess any changes required to the physical plant.
Levitt also stated that she did not want to disclose to the
landlord Amalgamated's intention to remain in the premises so as
not to undermine the company's bargaining position in

negotiations.  Similarly, Levitt discussed the company's plans by email with an Amalgamated employee negotiating with the ITPEU. Levitt stated, "I don't think that we want to close [the PSC] and I suspect that we can get a very good deal on the lease renewal. But if the company is not doing well later this year, it's a possibility we couldn't rule out."  During a meeting with the collective bargaining negotiating team, however, Levitt stated that Amalgamated was in negotiations with the landlord and that it planned to stay in the current PSC facility.

On July 7, 2010, Amalgamated announced that it had earned its 35th consecutive "'A' (Excellent)" rating from A.M. Best Company.  In a press release, Amalgamated noted that it earned this ranking due to its "financially strong condition and excellent claims-paying ability" as well as its "financial prudence and strategic, controlled growth."

David Walsh, Amalgamated's chief executive officer, has submitted an affidavit in which he stated that Bruce Raynor, the chairman of the company's board of directors, requested in the "late summer of 2010" that Amalgamated become a "leaner organization and reduce its costs."  Amalgamated's executives weighed the costs associated with closing the PSC.  In August 2010, Levitt, an executive vice president, circulated a draft analysis of the PSC's operations that supported keeping the PSC open.  Levitt stated that the PSC staff was experienced, proficient, and had a positive attitude.  She commented that they

"already accepted the 37.5 hour week with no increase in pay in
exchange for inclusion in the pension plan."  Levitt then added:

> An additional expense that needs to be
> considered with the closure is the
> retroactive payment for funding pension
> contributions for the union staff.   In the
> 2010 negotiations, the union traded wage
> increases for delayed inclusion in the
> pension plan effective 1/1/11 instead of
> 5/1/09.  This was done with the explicit
> assurance that the intention was to keep the
> facility operational.  The question of
> potential closure was specifically asked in
> union negotiations and at that time it had
> been determined that we did plan to renew the
> lease and had started discussions with the
> landlord.  This payment would probably be
> necessary to avoid legal action.

According to Walsh's affidavit, in the fall of 2010, the New
Hampshire operation could not be relocated to New York in a cost-
effective manner, but the staff at the New York office and the
PSC performed overlapping functions that could be consolidated
into a single facility.

In September 2010, Levitt emailed Chakraborty, an
Amalgamated vice-president, a "Proposal for the Pennsylvania
Service Center Operations," which stated that the "claims
production operation" would be closed by November 1, 2010, which
would eliminate 14 union "claims positions."  Although these
claims positions would be eliminated, certain essential staff
would be retained and, after the lease on the PSC expired, they
would be relocated or given the option to work from home.

On October 8, 2010, Walsh informed plaintiffs that they
would be laid off on October 29, 2010.  It is undisputed that

during this meeting Walsh stated that Amalgamated was closing the PSC due to a decreased workload at the facility and an ability to save money by condensing operations into the New York office. Plaintiffs learned during this meeting that they would not receive pension benefits for any portion of the time they worked at Amalgamated.

The minutes of Amalgamated's executive committee meeting on November 23, 2010 recorded that "Mr. Walsh reported that the Company had prepared for the closing of the Pennsylvania office as of February and that a resulting increase in call response time had been addressed and that response times were back down below one minute." Walsh declares in an affidavit that his statement during the November 2010 meeting referred to February 2011, when the lease on the PSC was to expire.

The record contains a letter dated November 24, 2010, from Hirsch, an Amalgamated vice-president and an administrator of the Pension Plan, to an unspecified recipient or recipients. He wrote that the non-union PSC employees had been made eligible for benefits in the Pension Plan effective May 10, 2007:

> Although the definition of 'Employee' in the [Amalgamated] portion of the Plan ... provides that employees in Pennsylvania are excluded, and although the [summary plan document] likewise excludes employees other than in New York and New Hampshire ..., as we recently advised you, [Amalgamated] has agreed to participation in the Plan by non-union employees in Pennsylvania effective May 10, 2007.

-15-

This letter further noted that "[c]redited service as of May 10, 2004 has always been explicitly excluded for employees in Pennsylvania."[6]  Consistent with this position, Hirsch sent a letter in December 2010 to an Amalgamated employee who was a member of ITPEU between May 10, 2004 and March 1, 2010.  In this letter Hirsch explained that the employee was only eligible for pension benefits as of the date she became a non-union employee.[7]

                              III.

        Following their termination, plaintiffs filed an eight-count complaint against ULLICO, Amalgamated, OPEIU, and ITPEU seeking to recover the pension benefits to which they believe they are entitled for the time they worked at Amalgamated.  On September 7, 2011, the court granted the motion of Amalgamated to dismiss counts I, II, III, and VII of the amended complaint.

        Following discovery, each of the four defendants moved for summary judgment as to the claims against it.  In response, plaintiffs stipulated to the dismissal of all claims against defendants ULLICO, OPEIU, and ITPEU.

        As a result, only Counts IV, V, and VIII remain pending against Amalgamated.  Each of these counts seeks relief under 29 U.S.C. § 1132(a)(3), a provision of ERISA, which permits "a

---

6.  This letter was attached to plaintiffs' opposition without a citation to an explanatory declaration or relevant deposition testimony.  It is unclear whether the recipient's or recipients' names have been redacted or were not included in the original document.  It is also unclear whether Hirsch actually transmitted this letter to anyone.

7.  This employee is not a plaintiff in this case.

                              -16-

participant, beneficiary, or fiduciary" to bring a civil action "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this title or the terms of the plan."  ERISA defines a "participant" as:

> any employee or former employee of an
> employer, or any member or former member of
> an employee organization, who is or may
> become eligible to receive a benefit of any
> type from an employee benefit plan which
> covers employees of such employer or members
> of such organization, or whose beneficiaries
> may be eligible to receive any such benefit.

29 U.S.C. § 1002(7).  The Supreme Court has explained that the term "participant" as used in ERISA refers to "either employees in, or reasonably expected to be in, currently covered employment, or former employees who have a reasonable expectation of returning to covered employment or who have a colorable claim to vested benefits."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117-18 (1989) (internal citations and alternations omitted).  Plaintiffs argue that they are entitled to equitable relief under § 1132(a)(3), and Amalgamated has not contested that plaintiffs are participants within the meaning of that provision. See Leuthner v. Blue Cross & Blue Shield of Ne. Pa., 454 F.3d 120, 124 (3d Cir. 2006); see also Becker v. Mack Trucks, Inc., 281 F.3d 372, 377 (3d Cir. 2002).

IV.

In Count IV of the amended complaint, plaintiffs allege that Amalgamated violated 29 U.S.C. § 1140 by discriminating against them in order to prevent them from qualifying for benefits under the Pension Plan.[8]  Section 1140 states:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140.

To prevail on a claim under § 1140, the employee must prove that "the employer made a conscious decision to interfere

---

8. Count IV originally requested both compensatory and equitable relief.  In granting the motion of Amalgamated to dismiss certain counts of the amended complaint, we explained that

> [i]n actions under § 1132(a)(3) the court only may award relief that was "typically available in equity in the days of the divided bench," such as injunctions, equitable liens, constructive trusts, and restitution.  Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212-13 (2002). Traditional equitable remedies do not include compensatory damages.  Sereboff v. Mid-Atl. Med. Servs. Inc., 547 U.S. 356, 359-65 (2006); see Eichorn II, 484 F.3d at 655.

Jenkins v. Union Labor Life Ins. Co., Inc., Case No. 10-7361, 2011 U.S. Dist. LEXIS 100663, at *20 (E.D. Pa. Sept. 7, 2011). Because compensatory damages are not available in an action under § 1132(a)(3), the court dismissed Count IV of the amended complaint to the extent it states a claim for compensatory damages.  Id.

-18-

with the employee's attainment of pension eligibility or
additional benefits." DeWitt v. Penn-Del Directory Corp., 106
F.3d 514, 523 (3d Cir. 1997).  We evaluate § 1140 claims under
the same burden-shifting framework that we apply in other
employment discrimination contexts.  See Turner v.
Schering-Plough Corp., 901 F.2d 335, 347 (3d Cir. 1990).  As our
Court of Appeals stated in Eichorn v. AT&T Corp.:

> To prove a prima facie case under § [1140] a
> plaintiff must show (1) that an employer took
> specific actions (2) for the purpose of
> interfering (3) with an employee's attainment
> of pension benefit rights. ... [O]nce a
> plaintiff makes a prima facie showing, the
> employer has the burden of articulating a
> legitimate non-discriminatory reason for his
> conduct.  Then, the burden shifts back to the
> plaintiff to show that the employer's
> rationale was pre-textual and that the
> cancellation of benefits was the
> "determinative influence" on the employer's
> actions.

Eichorn v. AT&T Corp. (Eichorn I), 248 F.3d 131, 149-50 (3d Cir.
2001) (quoting DiFederico v. Rolm Co., 201 F.3d 200, 205 (3d Cir.
2000)) (internal citations omitted).  The employee may use
circumstantial evidence to establish that "the discriminatory
reason more likely motivated the employer" or "that the
employer's proffered explanation is unworthy of credence."
DiFederico, 201 F.3d at 206 (quoting Tex. Dep't of Community
Affairs v. Burdine, 450 U.S. 248, 256 (1981)). Because a
plaintiff will rarely have a "'smoking gun'" demonstrating the
employer's intent, the employee may use circumstantial evidence
to prove that the employer's proffered reason for its conduct is

pretext.  Gavalik v. Cont'l Can Co., 812 F.2d 834, 852 (3d Cir. 1987).

In this case, plaintiffs assert that Amalgamated took three actions that interfered with their attaining benefits under the Pension Plan in violation of § 1140.  First, they contend that Amalgamated modified the terms of the Pension Plan in April 2004 in order to prevent plaintiffs from obtaining benefits.  It is evident from the record that Amalgamated requested that the Pension Plan board of trustees modify the terms of the Plan to exclude employees at the PSC, including plaintiffs, from qualifying for benefits.  The April 14, 2004 amendment "exclude[d] employees of the Pennsylvania office" of Amalgamated from the definition of "Employee" for the purposes of the Pension Plan.[9]  This amendment, as noted above, occurred before May 10, 2004 when plaintiffs began to work for Amalgamated.

The April 14, 2004 amendment to the Pension Plan did not violate § 1140.  Our Court of Appeals has explained, "The language enacted by Congress" in § 1140 "simply does not extend to actions taken before an employer-employee relationship exists."  Becker, 281 F.3d at 382.  Moreover, a formal plan amendment of the sort that occurred here is not an action that can give rise to liability under § 1140.  Our Court of Appeals has stated that § 1140 was intended as a remedy only "to actions affecting the employer-employee relationship."  Haberern v. Kaupp

_____

9.  The eligibility requirements for Amalgamated employees are set forth in Appendix II of the Pension Plan document.

<u>Vascular Surgeons Ltd. Defined Benefit Pension Plan</u>, 24 F.3d 1491, 1503 (3d Cir. 1994).  It has specifically ruled that plan amendments, even plan amendments that target one employee for exclusion, do not violate § 1140.  <u>Id.</u> at 1502-03.  In <u>Haberern</u>, the Court of Appeals cited at length to <u>McGath v. Auto-Body North Shore, Inc.</u>, 7 F.3d 665, 668 (7th Cir. 1993), a case in which the employer repeatedly amended the terms of a pension plan with the avowed purpose of preventing the plaintiff employee from becoming eligible for benefits.  <u>McGath</u>, 7 F.3d at 666-69.  The Court of Appeals for the Seventh Circuit held that this action was insufficient to justify relief under § 1140.  It explained that, "Simply put, § [1140] was designed to protect the employment relationship which *gives rise* to an individual's pension rights. ... This means that a fundamental prerequisite to a § [1140] action is an allegation that the employer-employee relationship, and not merely the pension plan, was changed in some discriminatory or wrongful way.  <u>Id.</u> at 668 (emphasis in original).  The April 14, 2004 amendment simply amended the pension plan and did not affect the employer-employee relationship, even assuming that such a relationship existed at that time when the plaintiffs had not yet begun to work for Amalgamated.

The Supreme Court has had occasion to comment on amendments to employee benefit plans in the context of § 1140.  It has made clear that, "An employer may, of course, retain the unfettered right to alter its promises, but to do so it must

-21-

follow the formal procedures set forth in the plan." Inter-Modal
Rail Emp. Ass'n v. Atchison, Topeka & Santa Fe Ry., 520 U.S. 510,
515-16 (1997).  At the same time, it cautioned, "The formal
amendment process would be undermined if § [1140] did not apply
because employers could 'informally' amend their plans one
participant at a time." Id. at 516.

         As plaintiffs read the Court's opinion in Inter-Modal,
an "informal" plan amendment can give rise to § 1140 liability if
done with the intent to "discriminate against a participant or
beneficiary ... for the purpose of interfering with the
attainment of any right to which such participant may become
entitled under the plan."  29 U.S.C. § 1140; Inter-Modal, 520
U.S. at 515-16.  Even if plaintiffs are correct, there is no
evidence in the record that the April 14, 2004 amendment to the
Pension Plan was "informal."  Plaintiffs rely on the deposition
testimony of Michael Hirsch, a Pension Plan administrator, for
the proposition that there existed some "process" that the board
of trustees did not follow in making that amendment.  No fair
reading of the testimony on which plaintiffs rely supports an
inference that the amendment at issue was made other than in
accordance with the Plan's requirements or using a procedure that
deviated from the board of trustees' normal practices.  The
amendment was simply the result of a decision by Amalgamated not
to extend pension benefits to certain employees.  ERISA permits
such an action.

-22-

Case 2:10-cv-07361-HB   Document 101   Filed 10/24/12   Page 23 of 37

Plaintiffs next take issue with the three-year eligibility period, which as stated in the Q&A, would be counted toward the five-year vesting period for pension benefits.  They assert that this is a violation of § 1140 because no other Amalgamated employees had such an eligibility period.  They also point to testimony by Amalgamated vice-president Levitt in which she stated that at the time the Q&A was drafted, Amalgamated had decided not to offer pension benefits until after it knew whether the contracts with ULLICO for processing claims would be renewed.  "ERISA does not mandate that employers provide any particular benefits, and does not itself proscribe discrimination in the provision of employee benefits."  Shaw v. Delta Air Lines, 463 U.S. 85, 91 (1983).  Plaintiffs have not explained why this three-year eligibility period violates § 1140 in light of Amalgamated's freedom under ERISA to adopt an employee benefit plan and to choose which employees would be entitled to participate and when.  Id. at 91.  Moreover, like the April 14, 2004 amendment to the Pension Plan, the three-year vesting requirement is not an action affecting the employer-employee relationship.  See Haberern, 24 F.3d at 1502-03.

Plaintiffs further argue that Amalgamated interfered with their rights under the Pension Plan when, in 2010, it proposed alternative CBAs, one that would entitle plaintiffs to vested pension benefits as of June 2009 and a second that would entitle plaintiffs to vested pension benefits as of January 2011. The union membership, which included plaintiffs, voted for the

-23-

latter vesting date in return for higher wages in the interim. The court is at a loss to see how the options offered by Amalgamated could possibly be a violation of § 1140.  Amalgamated did not interfere with plaintiffs' benefits under the Pension Plan by making the alternative CBA proposals in 2010 since it gave the union members the choice of which one to accept. Plaintiffs were not eligible for Pension Plan benefits at any time earlier than 2011 because, as noted above, they were explicitly excluded on April 14, 2004 from receiving such benefits and had rejected the opportunity for inclusion in such benefits from June 2009.  Plaintiffs' argument is without merit.

Plaintiffs' brief in opposition to the motion of Amalgamated for summary judgment implies—although it stops short of saying outright—that Amalgamated terminated plaintiffs to prevent them from accruing pension benefits.[10]  Plaintiffs were terminated five months after ITPEU and Amalgamated finalized the terms of the 2010 MOU and three months before they were scheduled to begin accruing Pension Plan benefits.  In her August 2010 analysis, Levitt recognized that Amalgamated had represented to the union during collective bargaining negotiations that the PSC would stay open when the lease on the facility expired in 2011 and that the union members had passed up the opportunity to

---

10.  Plaintiffs argue that Amalgamated's decision to terminate them for alleged economic reasons was a pretext to hide its discriminatory intent.  This argument only makes sense if plaintiffs contend that Amalgamated violated § 1140 by terminating them to prevent them from attaining Pension Plan benefits.

-24-

accrue pension benefits from June 2009 instead of January 2011.[11]
She suggested that Amalgamated might make a "retroactive payment
for funding pension contributions for the union staff" to
forestall a legal action, although she did not specify who would
make or receive this payment or how it would benefit plaintiffs.
The Court of Appeals has explained that the employee's burden of
making out a prima facie case under § 1140 is "not onerous."
Jakimas v. Hoffmann-LaRoche, Inc., 485 F.3d 770, 787 (3d Cir.
2007).  Drawing all inferences in plaintiffs' favor, we will
assume without deciding that these facts are sufficient to carry
plaintiffs' burden of introducing prima facie evidence of a
§ 1140 violation.  See id., 485 F.3d at 786-88; Eichorn I, 248
F.3d at 149-50; DiFederico, 201 F.3d at 204; Turner, 901 F.2d at
347-48.

        We must now determine whether Amalgamated has come
forward with a non-discriminatory reason for its conduct.
Eichorn I, 248 F.3d at 149-50.  Amalgamated asserts that it
terminated plaintiffs in October 2010 because the company
intended to consolidate the work performed at the PSC with the
work being performed in its New York office to save money.

        Plaintiffs have come forward with no evidence from
which a factfinder could determine that the discriminatory reason
is more worthy of belief or that Amalgamated's proffered reason

---

11.  In her analysis, Levitt stated that the plaintiffs had
forgone the opportunity to accrue benefits from May 1, 2009, but
the proposal placed before the ITPEU members would have permitted
benefits to accrue from June 2009.

for terminating plaintiffs is "unworthy of credence."
DiFederico, 201 F.3d at 206.  To show pretext, plaintiffs rely
upon the July 7, 2010 press release in which Amalgamated's chief
executive officer, David Walsh, said that the company enjoyed a
"financially strong condition."  Plaintiffs also point to certain
oral statements Walsh made in the fall of 2010 concerning the
company's financial health and strong sales performance.  That
the company was, according to Walsh, already financially sound
does not in any way undermine evidence that Amalgamated was
intent on effecting cost-savings by consolidating claims
processing operations into its New York facility.  Indeed, a
company remains healthy and competitive only if it is ever
mindful of obtaining greater efficiencies and cuttings costs.
There is voluminous evidence in the record corroborating the
position that Amalgamated closed the PSC as part of its business
strategy.  There is nothing to support the inference that
Amalgamated did so to prevent plaintiffs from accruing benefits
under the Pension Plan.  Although we need not highlight all of
this evidence, it is particularly significant that Amalgamated
offered plaintiffs the opportunity to begin accruing pension
benefits from June 2009 a few months before their termination in
October 2010, but the union of which plaintiffs are members voted
to reject that opportunity.  Moreover, Bruce Raynor, the chairman
of Amalgamated's board of directors, did not request that the
company become "leaner" until after the 2010 MOU had been
finalized.

In sum, there is nothing in the record from which a factfinder could return a verdict in plaintiffs' favor on Count IV of the amended complaint.  Summary judgment will be granted in favor of Amalgamated.

V.

In Count V, plaintiffs allege that Amalgamated should be equitably estopped from taking a position regarding their eligibility for benefits under the Pension Plan that varies from the representations Amalgamated made when plaintiffs began employment.  "[T]o state a cause of action for equitable estoppel under ... 29 U.S.C. § 1132(a)(3), an ERISA plaintiff must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances."  Burstein v. Retirement Account Fund for Emp. of Allegheny Health Educ. & Research Found., 334 F.3d 365, 383 (3d Cir. 2003); see Pell v. E.I. DuPont de Nemours & Co. Inc., 539 F.3d 292, 300 (3d Cir. 2008).[12]  The requirement of demonstrating "extraordinary circumstances" is a "heightened requirement[]" that obligates the plaintiff to "do more than merely make out the 'ordinary elements' of equitable estoppel" Kurz v. Phila. Elec. Co., 96 F.3d 1544, 1553 (3d Cir. 1996).

---

12.  Our Court of Appeals has "intimated," although it has not explicitly held, that a claim for equitable estoppel under ERISA will lie only against a fiduciary of a benefit plan.  Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 235 & n.16 (3d Cir. 1994).  "ERISA makes clear that a fiduciary is one that maintains discretionary authority or discretionary responsibility in the administration of the plan."  Id. at 234.  Amalgamated has not argued that it is not a "fiduciary" for the Pension Plan.

-27-

Whether a misrepresentation was "material" is a mixed question of law and fact.  Fisher v. Phila. Elec. Co., 994 F.2d 130, 135 (3d Cir. 1993).  Our Court of Appeals has explained that "a misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision" about his or her benefits.  Id. Summary judgment on the issue of materiality is permissible "only if "reasonable minds cannot differ."  Id.  The Q&A document that Amalgamated distributed to plaintiffs and other ULLICO employees on March 19, 2004 misrepresented that plaintiffs would be eligible for pension benefits.  Amalgamated reaffirmed this specific misrepresentation by explaining that, generally, benefits offered at Amalgamated would "mirror" those offered at ULLICO, which included a pension plan.  Viewing the record in the light most favorable to plaintiffs, we cannot say as a matter of law that a reasonable employee would not be misled by the Q&A in making a decision about whether to accept employment with Amalgamated.

Plaintiffs' reliance on this misrepresentation must have been reasonable and must have caused injury.  Pell, 539 F.3d at 301.  Amalgamated argues that plaintiffs could not reasonably rely on the statement in the March 19, 2004 Q&A because the National Labor Relations Act required all terms and conditions of plaintiffs' employment to be memorialized in a CBA.  Amalgamated has cited no cases, however, in which any court has found

reliance on a misrepresentation regarding benefits unreasonable because it was not contained in a CBA.

Plaintiffs Raymond Gunther, Teresa Lattanze, and John F. Van Allen III testified during their depositions that they would have accepted employment with Amalgamated in 2004 even if they had known that they were not receiving pension benefits. Additionally, there is no evidence in the record that plaintiff Jacqueline Mays relied in any way upon the misrepresentation in the Q&A.[13] Plaintiff Troy Johnson testified he was not sure what he would have done had he known in 2004 that he would not receive pension benefits at Amalgamated. As to these five plaintiffs, there is nothing before the court to permit an inference that they relied to their detriment on Amalgamated's representation concerning pension benefits.

The remaining seven plaintiffs testified that they relied, to some degree, on Amalgamated's misrepresentation. Plaintiffs Karen Jenkins and Linda Russel testified that they would not have accepted a job with Amalgamated in 2004 had they known they would not receive pension benefits.[14]  Plaintiffs

---

13.  Unlike the other plaintiffs, it does not appear Mays was asked at her deposition whether she would have accepted employment with Amalgamated even if she had known she would not receive a pension.  Her affidavit, attached as an exhibit to plaintiffs' opposition, does not include any facts that would permit an inference she relied on Amalgamated's misrepresentation concerning pension benefits.

14.  According to ¶ 33 of plaintiffs' response to Amalgamated's statement of uncontested facts, plaintiff Linda Russel testified that she would not have accepted a job with Amalgamated in 2004
(continued...)

Donna Anderson, Debra Kontra, Michelle Quarles, Sharon W. Shultz,
and Susan R. Lolli[15] testified that they would have accepted the
job with Amalgamated and then looked for other employment
offering pension benefits.  None of these plaintiffs had the
opportunity to accrue pension benefits while working at
Amalgamated.  Thus, as to these seven plaintiffs, the evidence in
the record supports an inference that they relied to their
detriment on Amalgamated's misrepresentation regarding pension
benefits.

        Under the third prong to any § 1132(a)(3) equitable
estoppel claim, plaintiffs must come forward with evidence of
"extraordinary circumstances."  In this context, the phrase
"extraordinary circumstances" does not have a "rigid definition"
but typically involves "acts of bad faith on the part of the
employer, attempts to actively conceal a significant change in
the plan, or commission of fraud."  <u>Jordan v. Fed. Express Corp.</u>,
116 F.3d 1005, 1011 (3d Cir. 1997).  Extraordinary circumstances

_____

14.(...continued)
had she known that she would not receive pension benefits.  The
relevant page from the deposition transcript is not contained in
the record.  We will accept counsel's representation that the
quotation accurately reflects Russel's testimony.

15.  Plaintiff Lolli testified that she would have looked for a
new job in 2007 had she known Amalgamated was not offering
pension benefits in the 2007 CBA.  The excerpt of her deposition
before the court does not reveal whether she was asked a similar
hypothetical concerning 2004.  A factfinder drawing all
inferences in her favor could determine that if she would have
been unwilling to remain employed in 2007 knowing she had no
pension, she also would have been unwilling to accept employment
in 2004 on those terms.

also may involve repeated misrepresentations "over an extended course of dealing" or plaintiffs who "are especially vulnerable." Pell, 539 F.3d at 303-04.  Our Court of Appeals has explained that "simple ERISA reporting errors or disclosure violations, such as a variation between a plan summary and the plan itself" do not give rise to extraordinary circumstances.  Kurz, 96 F.3d at 1553; see also Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1142 (3d Cir. 1993).

For present purposes, we will draw all inferences in plaintiffs' favor.  Amalgamated misrepresented in the Q&A distributed on March 19, 2004 that plaintiffs would become eligible for pension benefits after three years and would vest in those benefits after five years.  On the same day the Q&A was distributed, Amalgamated personnel told plaintiffs that benefits at Amalgamated would "mirror" those offered at ULLICO.  However, a "General Overview" document that described the "coverage and benefits" that ULLICO employees would receive at Amalgamated was distributed alongside the Q&A.  The "General Overview" addressed only benefits and did not mention a pension.  When Amalgamated wrote letters to plaintiffs offering them employment, Amalgamated stated that the "General Overview" gave a "quick summary of our benefit programs."  No mention was made of the Q&A.  On April 14, 2004, before plaintiffs became employees, Amalgamated had the Pension Plan amended to exclude all employees at the PSC from eligibility for benefits under that plan.

During the 2004 CBA negotiations between ITPEU and
Amalgamated, the ITPEU union representative raised the
possibility of plaintiffs receiving pension benefits and
Amalgamated stated it could not afford such benefits.  The 2004
CBA did not make any provisions for ITPEU members to receive
pension benefits.  All of the plaintiffs received a copy of the
CBA and thus knew that there were no such benefits for them.
None of the plaintiffs raised any alarm at that time.

Plaintiffs have produced a document entitled "A General
Overview of Coverage and Benefits as a Union Employee @ King of
Prussia," dated July 2005, which states that plaintiffs would be
eligible for pension benefits after three years of employment and
would vest in such benefits after five years of employment.[16]
Plaintiffs have not explained who distributed this second
"General Overview" document to plaintiffs, exactly when it was
distributed, or who authored it.  This document is referenced by
just one of the plaintiffs in an affidavit in which she states
only that it was disseminated "to let us know what we would
receive in the King of Prussia Office of [Amalgamated]."  None of
the other plaintiffs even mentions it.

In 2007, ITPEU and Amalgamated negotiated a CBA that,
like the 2004 CBA, did not provide for plaintiffs to receive a
defined benefit pension.  As in 2004, no plaintiff expressed

_____

16.  In a footnote, Amalgamated argues we should not consider
this document because plaintiffs purportedly failed to produce
the document in response to discovery requests.  Amalgamated's
argument is not supported by evidence in the record.

concern that the 2007 CBA did not provide for a defined benefit
pension.  In 2009, Amalgamated offered the ITPEU members the
opportunity to begin accruing benefits in the Pension Plan as of
June 2009 or January 2011.  Once again, no plaintiff raised the
objection that Amalgamated was already providing them with
defined pension benefits as set forth in the Q&A or the 2005
General Overview.  Indeed, the union membership voted not to
start accruing Pension Plan benefits until January 2011 in
exchange for higher salaries during the three-year period
governed by the 2010 MOU.

        These facts, taken in the light most favorable to
plaintiffs, are legally insufficient to prove the kind of
"repeated misrepresentations" by the defendant that will give
rise to a finding of extraordinary circumstances.  Compare Pell,
539 F.3d at 297-99, 304; Curcio v. John Hancock Mut. Life Ins.
Co., 33 F.3d 226, 237-38 (3d Cir. 1994); Smith v. Hartford Ins.
Grp., 6 F.3d 131, 134-35 (3d Cir. 1993).  In each of those cases,
the Court of Appeals found extraordinary circumstances existed
because of the "diligence" or "persistent questioning" by the
participant or beneficiary in ascertaining his or her rights
under an employee benefit plan.  Smith, 6 F.3d at 142; see Pell,
539 F.3d at 304-05.  Also, in each those cases, the defendant or
its agent represented directly to the plan participant or
beneficiary that he or she would receive a specific monetary
benefit or a specific type of insurance coverage under the plan.
The undisputed facts in the record reflect that no plaintiff

                            -33-

exercised anything approaching diligence or persistence in attempting to determine the amount of his or her defined benefit pension prior to termination.  The record does not contain a single instance in which any plaintiff asked a representative of Amalgamated or ITPEU about the existence or value of defined pension benefits.

Plaintiffs' claim is more analogous to those cases in which our Court of Appeals has held that extraordinary circumstances do not arise from inaccuracies or omissions in summary plan documents.  See Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1318-19 (3d Cir. 1991); see also Kurz, 96 F.3d at 1553.  In Gridley, a beneficiary sought to recover supplemental life insurance offered through a plan her husband's employer began to sponsor several days after her husband became gravely ill and stopped reporting to work.  Gridley, 924 F.2d at 1314.  A brochure distributed to all employees describing the additional benefits did not explain that the plan participant must be "actively at work" to qualify for benefits.  Id.  When the beneficiary's husband died, the insurer refused to pay the supplemental life insurance benefits because the beneficiary's husband had not been "actively at work" when he enrolled in the plan.  Id. at 1315.  The Court of Appeals explained that the plan brochure's omission of the "actively at work" requirement did not amount to extraordinary circumstances.  Id. at 1318-19.  In the matter before us, the information circulated to the plaintiffs in 2004 and 2005 contained misstatements instead of omissions, but

-34-

in our view, these errors are legally insufficient to constitute extraordinary circumstances.

Plaintiffs also argue that Amalgamated actively concealed a significant change to the Pension Plan and that it acted in bad faith.  See Burstein, 334 F.3d at 383.  There is no evidence before the court that can support a finding that Amalgamated concealed a change in the Pension Plan from plaintiffs or from anyone.  To the contrary, the amendment is recorded in the minutes of the Pension Plan's board of trustees. At the time of the April 14, 2004 amendment to the Pension Plan, plaintiffs did not yet work for Amalgamated although some had accepted offers to join the company as an employee on May 10, 2004.  The plaintiffs were union members and their terms and conditions of employment were governed by a CBA or MOU. Moreover, they had specific notice through the 2004 and 2007 CBAs, the 2010 MOU, and the union vote in 2009 that Amalgamated was not providing defined pension benefits before January 2011. Amalgamated's references in the 2004 Q&A and the July 2005 "General Overview" certainly reflect an unfortunate inattention to detail about the benefits available to employees at the PSC, but it cannot be said that these two references over a two-year period demonstrate bad faith in light of the other information of which plaintiffs were cognizant and the failure of plaintiffs to make any inquiries.

We reiterate that principles of ordinary equitable estoppel are not applicable here.  Kurz, 96 F.3d at 1553.  For

estoppel to exist in the ERISA context, extraordinary circumstances amounting to fraud or bad faith must be present. No such extraordinary circumstances exist in this case.  In addition, plaintiffs Raymond Gunther, Troy Johnson, Teresa Lattanze, Jacqueline Mays, and John F. Van Allen III have not come forward with any evidence that they detrimentally relied on any Amalgamated misrepresentation concerning defined benefit pensions.  Accordingly, the motion of Amalgamated for summary judgment on Count V of the amended complaint will be granted.

VI.

Finally, in Count VIII, which is pleaded in the alternative to Counts IV and V, plaintiffs allege that they should recover money from Amalgamated to prevent it from being unjustly enriched.[17]  As is amply clear from the foregoing discussion, plaintiffs were not entitled to benefits under the Pension Plan at any time prior to their termination. Accordingly, plaintiffs have not made any showing that Amalgamated was unjustly enriched in any way.  Summary judgment in favor of Amalgamated will be granted.

VII.

Along with their opposition to the motion of Amalgamated for summary judgment, plaintiffs filed a cross-motion

---

17.  We have construed Count VIII as a claim for unjust enrichment under § 1132(a)(3) because a state-law claim for unjust enrichment would be preempted by ERISA.  <u>Jenkins v. Union Labor Life Ins. Co., Inc.</u>, No. 10-7361, 2011 U.S. Dist. LEXIS 100663, at *26-*27 (E.D. Pa. Sept. 7, 2011).

-36-

for summary judgment.  The First Scheduling Order, dated
October 7, 2011, required the parties to file any dispositive
motion on or before July 16, 2012.  All defendants filed their
motions for summary judgment by that date.  At plaintiffs'
request, the court twice extended the time within which to oppose
the motion of Amalgamated for summary judgment.  The cross-motion
of plaintiffs for summary judgment was filed with that opposition
on September 12, 2012, nearly two months after the deadline for
the filing of dispositive motions.  Because the motion of
plaintiffs for summary judgment was filed untimely, it will be
denied.